09-4694-cr
USA v. Andino

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2010

(Argued:     October 14, 2010                    Decided:     December 3, 2010)

Docket No. 09-4694-cr

_____

UNITED STATES OF AMERICA,

*Appellee*,

– v. –

JOSE ANDINO,

*Defendant-Appellant*.

_____

Before: KEARSE, CALABRESI, WESLEY, *Circuit Judges*.

Defendant-Appellant Jose Andino appeals from a judgment of conviction of the United States District Court for the Southern District of New York (Naomi Reice Buchwald, *J.*) on one charge of conspiring to distribute or possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. Andino challenges his conviction on two grounds: (1) that the evidence was insufficient to support a finding of guilt beyond a reasonable doubt; and (2) that the trial court erroneously declined to adopt his proposed jury instructions. Both claims hinge on the question of whether the government in this case bore the burden of proving cocaine-specific *scienter*—that is, Andino's knowledge that the conspiracy specifically involved cocaine. We hold that the government did not bear this burden and was instead required to show only that Andino knowingly participated in a conspiracy involving a controlled substance. We therefore reject both of Andino's claims and **AFFIRM** his conviction.

_____

YUANCHUNG LEE, Federal Defenders of New York, Inc., Appeals Bureau, New York, NY, *for Defendant-Appellant*.

JESSE M. FURMAN, Assistant United States Attorney, *for* PREET BHARARA, United States Attorney, Southern District of New York (RANDALL W. JACKSON, Assistant United States Attorney, *on the brief*), New York, NY, *for Appellee*.

CALABRESI, *Circuit Judge*:

## BACKGROUND

### I.      Investigation and Arrest

In June 2008, customs officials discovered cocaine in a package addressed to "Andino Jose" at "1474 Bryant, A2, Apt Basement, Bronx, NY 10460." The package was redirected to the New York City office of U.S. Immigration and Customs Enforcement, where agents prepared it for a controlled delivery to Andino, the Defendant-Appellant in this case. The agents opened the package, replaced the cocaine with a look-alike substance, resealed the package, and sent it on its way.

The controlled delivery occurred on June 23, 2008. A postal inspector disguised as a mail carrier delivered the package to 1474 Bryant, where he left the package with a woman claiming to know Andino. The woman then called Andino and informed him of the package's arrival.

Andino showed up a few minutes later. He entered the building, picked up the package, and transported it to an adjacent building (1472 Bryant), where he left it unopened. He then exited 1472 Bryant, at which point he was arrested.

In custody, Andino confessed that a man going by the name of "Mikey"—whom agents later identified as Keithroy Davis—had instructed him to receive the package and to transport it to 1472 Bryant, promising to "take[] care of" Andino if he agreed to do so. Andino also confessed that he was aware that the package contained drugs, but maintained that he believed the drugs to be marijuana rather than cocaine.

2

## II. Proceedings Below

Andino and Davis were indicted together on one count of conspiring to distribute, and to possess with intent to distribute, 500 grams and more of cocaine, in violation of the Controlled Substances Act. Specifically, the indictment alleged that Andino and Davis "unlawfully . . . conspire[d] . . . to violate the narcotics laws of the United States," and that "[i]t was a part and an object of the conspiracy that [Andino and Davis] would and did distribute and possess with intent to distribute a controlled substance, to wit, 500 grams and more of . . . cocaine . . . in violation of Sections 812, 841(a)(1), and 841(b)(1)(B) of Title 21, United States Code." J.A. 9. Davis pleaded guilty on April 24, 2009; Andino took his case to trial.

Prior to Andino's trial, Andino and the government proposed jury instructions to the District Court. Among other things, the submitted instructions differed on the *scienter* element of the conspiracy charge. On the government's instructions, the jury did not need to find that Andino "knew that the conspiracy involved cocaine in particular." Rather, it could establish guilt if it found "that he knew that [the conspiracy] involved *any* controlled substance." S.A. 35 (emphasis added). On Andino's instructions, by contrast, the jury had to find that Andino "had an understanding of the unlawful purpose of the plan, including the nature and anticipated weight of the substance involved." S.A. 14.

The first discussion of the *scienter* issue occurred early in the trial. Andino pointed to our decisions in *United States v. Santos*, 541 F.3d 63, 70–71 (2d Cir. 2008), and *United States v. Adams*, 448 F.3d 492, 499–500 (2d Cir. 2006), which he characterized as holding that "[a] conspiracy charging an enhanced quantity of a controlled substance . . . requires knowledge or reasonable foreseeability of the type and quantity of the substance whose distribution was the object of the conspiracy." S.A. 71–72. The government responded that Andino's proposed rule

3

ran afoul of "[t]he established law of the Second Circuit, as well as the law of every other Circuit that has addressed this question." S.A. 80. Appearing to agree with the government, the district judge expressed her view there was "a ton of case law that says if he thought it was heroin and it turned out to be cocaine, or the reverse I guess which is more serious, he is stuck." J.A. 166. But she did not decide the issue.

The question resurfaced at the close of the government's case, when Andino moved for acquittal under Federal Rule of Criminal Procedure 29. Andino's counsel stated that the government had at most proven that Andino "believed that there was marijuana in the package," which given what he claimed to be the applicable *scienter* standard, was insufficient to sustain a conviction on the conspiracy charge. J.A. 380. The District Court denied the motion, stating that "the government does not have to accept, and it doesn't, that Mr. Andino is telling the truth when he said, oh, I thought it was marijuana. It could be just his second false exculpatory statement." J.A. 381.

Following the court's denial of the Rule 29 motion, it held another conference on the jury charges. On the court's new proposed set of instructions, the jury would be asked three questions:

> The first is: Did the defendant enter into a conspiracy to violate the narcotics laws of the United States?
>
> And, secondly: Did he know or reasonably foresee that the cocaine, in a sense, would be delivered?
>
> The third: How much cocaine did he anticipate?

J.A. 389. According to this proposal, the court explained, Andino would be convicted if the jury answered "yes" to Question 1, but he would not face the enhanced penalties applicable to a cocaine-specific offense unless the jury answered "yes" to Question 2.

4

This time around, it was the government's turn to object. Specifically, the government expressed concern that the instructions "open[ed] up the possibility of the defendant being convicted of participating in a conspiracy to distribute a drug other than cocaine." J.A. 392. But given that the government had "allege[d] in the indictment that it is a cocaine conspiracy," a non-cocaine conviction might result, improperly, in a constructive amendment of the indictment. J.A. 392. Confronted with this possibility, the District Court withdrew the proposed instructions, stating that "[t]he government now is sort of prepared to go for the whole enchilada." J.A. 400. The government responded that it "absolutely do[es] want to go for the whole enchilada." J.A. 400.

Meanwhile, Andino requested that the court "make it clear to [the jurors that] if they find it was a marijuana conspiracy, they must acquit." J.A. 399. But the court denied the request, observing that "I don't charge theories. You can argue your theory." J.A, 412. Notably, and surprisingly, the government stated that it "welcome[d]" Andino's argument that if he "was engaged in a marijuana conspiracy, the jury should acquit." J.A. 400.

Ultimately, and despite all of the above described discussions, the court instructed the jury that the government was required to prove, first, "an agreement or understanding to violate those provisions of the law which make it illegal to distribute or possess with intent to distribute a controlled substance, namely, cocaine," and, second, that Andino "knowingly became a member of the conspiracy, that is, that he knowingly associated himself with and participated in the alleged conspiracy to distribute and possess with intent to distribute a controlled substance, namely, cocaine." J.A. 511.

III.    **Conviction and Appeal**

5

The jury returned a guilty verdict, finding that Andino conspired to distribute or possess with intent to distribute cocaine in the amount of less than 500 grams.[1] At sentencing, Andino argued for a reduced sentence on the ground that the record "really point[s] to a marijuana conspiracy." S.A. 100. The District Court rejected this argument, stating that it had "ma[d]e it very clear over and over again in the charge" that this "was a cocaine case . . . . They ha[d] to find it was cocaine." S.A. 100. The court then imposed a sentence of 48 months' imprisonment.

Andino timely appealed his conviction to this court.

## DISCUSSION

Andino challenges his conviction on two grounds. First, he argues that the evidence was insufficient to support a cocaine-specific conspiracy conviction, because the evidence showed only an intent to possess and distribute marijuana. Second, he argues that the trial court erred in refusing to issue his requested instruction to the jury—namely, that acquittal was warranted if the government failed to prove that Andino specifically agreed to possess and distribute cocaine. Both challenges depend on the premise that the government was here required to satisfy a cocaine-specific *scienter* burden, demonstrating not merely that Andino knowingly joined a conspiracy to possess and distribute a controlled substance, but also that he specifically conspired to possess and distribute cocaine. We conclude, however, that this premise is incorrect, and hold that, in order to satisfy the *scienter* element, the government was here required to prove only that Andino agreed to traffic in a controlled substance. We therefore reject both challenges and affirm Andino's conviction.

## I.    The Government's *Scienter* Burden

---

[1] Andino has understandably not contested the difference between the quantity of cocaine alleged in the indictment (500 grams and more) and the quantity of cocaine for which he was convicted (less than 500 grams). *Cf. United States v. Wanton*, 380 F.2d 792, 795 (2d Cir. 1967) ("A variance as to quantity between the indictment and the proof is not fatal.").

*a.* *The Statutory* Scienter *Burden*

Enacted as part of the Controlled Substances Act ("CSA"), 21 U.SC. § 841(a) provides that "it shall be unlawful for any person knowingly or intentionally to . . . distribute, or . . . possess with intent to . . . distribute . . . a controlled substance." 21 U.S.C. § 841(a)(1). And § 841(b) of that title prescribes maximum and minimum punishments depending on the type and quantity of the controlled substance involved in the offense. 21 U.S.C. § 841(b).

In interpreting § 841, we have adhered to the principle that "the government does not have to prove that the defendant knew the specific nature and amount of the controlled substance for the enhancement provisions to apply." *United States v. Collado-Gomez*, 834 F.2d 280, 280-81 (2d Cir. 1987) (per curiam). This result derives from "the structure and language" of the provision, which "clearly indicates that the terms 'knowingly or intentionally' in § 841(a) modif[y] the conduct set forth in that sub-section of the statute, and not the penalty provisions in § 841(b)." *United States v. King*, 345 F.3d 149, 153 (2d Cir. 2003) (per curiam). Put another way, § 841's *scienter* requirement is not type-specific. To convict on charges of cocaine possession, for example, the government need not prove that a defendant knowingly or intentionally possessed cocaine; rather, it need only prove that the defendant knowingly or intentionally possessed a controlled substance that was in fact cocaine. On this point the precedents are consistent and clear.

Andino, however, was not convicted of a direct offense; rather, he was convicted under the CSA's *conspiracy* prohibition, which subjects drug conspirators to the "same penalties as those prescribed for the [object] offense." 21 U.S.C. § 846. In particular, the jury found that Andino conspired to violate § 841—*i.e.*, that he conspired to distribute or possess with intent to distribute a controlled substance—and that the conspiracy involved cocaine in the amount of less

7

than 500 grams. As a result, Andino was sentenced pursuant to § 841(b)(1)(C), which, through § 846, establishes the penalty range for conspiracy convictions involving the relevant amount and type of controlled substance.

The question thus arises whether this statutory framework requires the government to prove that a conspiracy defendant has specific knowledge of the type and quantity of the drugs involved in the conspiracy. On this question the parties suggest—incorrectly, we believe—that our precedents are in some tension with each other. The government asserts—and Andino does not deny—that we have sometimes expressed the view that "the *mens rea* requirement for conspiracy is satisfied simply if the government shows that the defendant intended to distribute and possess with the intent to distribute *any* controlled substance." *United States v. Abdulle*, 564 F.3d 119, 126 (2d Cir. 2009); *see also United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010) ("The knowledge of the parties is relevant to a conspiracy charge to the same extent as it may be for conviction of the substantive offense." (internal quotation and citation omitted)); *United States v. Morgan*, 385 F.3d 196, 206 (2d Cir. 2004) ("Here, the government had to establish to the jury's satisfaction beyond a reasonable doubt that [the defendant] knew that she was engaged in a conspiracy to import into the United States some controlled substance." (internal citations omitted)). But Andino notes that in other cases we have applied a stricter *scienter* burden, holding in particular that "[c]onviction of a Section 841(b)(1)(A) conspiracy . . . . require[s] proof that . . . drug type and quantity were at least reasonably foreseeable to the co-conspirator defendant." *Adams*, 448 F.3d at 499; *see also Santos*, 541 F.3d at 70-71 (citing *Adams* for the proposition that "in a conspiracy punishable under 21 U.S.C. § 841(b)(1)(A), the government must also prove . . . that it was either known or reasonably foreseeable to the defendant that the conspiracy involved the drug type and quantity charged"); *United States v. Martinez*, 987 F.2d

8

920, 926 (2d Cir. 1993) (similar). These seemingly mixed messages, it is said, have created significant confusion regarding the requisite *scienter* burden in drug conspiracy cases— confusion that assertedly was reflected in the trial proceedings in this case.[2]

But whatever the tension some of the language of these cases may seem to suggest, we believe that, in context, there are no inconsistencies in the prior holdings. In fact, all of our cases accord with the rule that the government need not prove *scienter* as to drug *type* or *quantity* when a defendant personally and directly participates in a drug transaction underlying a conspiracy charge. *See United States v. Chalarca*, 95 F.3d 239, 243 (2d Cir. 1996) ("[T]he quantity of drugs attributed to a defendant need not be foreseeable to him when he personally participates, in a direct way, in a jointly undertaken drug transaction."); *United States v. Oluigbo*, 375 Fed. App'x 61, 64 (2d Cir. 2010) (summary order); *United States v. Wade*, 217 Fed. App'x 77, 79 (2d Cir. 2007) (summary order).

We reaffirm this rule today. Under 21 U.S.C. § 846, the government need not prove foreseeability of drug type and quantity to the extent that it seeks to hold a defendant accountable for drug transactions in which the defendant directly and personally took part.[3] In cases like the

---

[2] We note that Andino's decision to go to trial may have derived in part from this alleged uncertainty of our prior case law, and that a plea agreement might well have subjected Andino to a lighter sentence than the one he received at trial. Whether under the circumstances any form of relief might be available is not before us.

[3] In this respect we note that in *Adams*, *Santos*, and *Martinez*—cases in which we required proof that drug type and quantity were reasonably foreseeable—the defendants did not directly and personally participate in the underlying drug transactions. *See Adams*, 448 F.2d at 495 (defendant recruited another individual to transport drugs on his behalf); *Santos*, 541 F.3d at 72 (defendant "expressed interest" in taking part in the narcotics transaction, but never had the opportunity to do so); *Martinez*, 987 F.2d at 922 (defendant was a "late-comer" to the drug conspiracy, and thus played no part in many of the transactions for which the government sought to hold him accountable). And in *Abdulle* and *Morgan*—cases in which we did not require proof of reasonable foreseeability as to type and quantity—the defendant's participation was direct and personal. *See Abdulle*, 564 F.3d at 122-23 (defendant was a passenger in the vehicle transporting drugs to a distribution center); *Morgan*, 385 F.3d at 198-204 (defendants personally transported into the United States packages containing ecstasy-like pills).

9

present one, where the defendant personally and directly participated in the drug transaction underlying the conspiracy charge, the government need not prove that the defendant had knowledge of either drug type or quantity.

The record in the case before us makes clear that Andino's participation in the drug transaction was anything but peripheral, as indicated by the uncontroverted evidence (a) that the incriminating package bore his name; (b) that he physically possessed the package after it arrived at the listed address; and (c) that he transported the package to a neighboring building, where his co-conspirators later picked it up. These facts alone demonstrate that Andino directly and personally took part in the drug transaction giving rise to his conspiracy charge. Consequently, the government was not subject to the reasonable foreseeability requirement; it did not bear the burden of proving that Andino reasonably believed that the package contained cocaine; and, as to Andino's *scienter*, it was required to show only that Andino believed that the package contained a controlled substance of one type or another.

*b.* *Andino's Indictment and the Government's Statements at Trial*

Independent of the statutory *scienter* issue, Andino argues that the government here committed itself to proving cocaine-specific knowledge on Andino's part, by indicting him on cocaine-specific charges and by asserting at trial that it "absolutely [did] want to go for the whole enchilada" of a cocaine-specific conviction. To support this claim, and citing *United States v. Wozniak*, 126 F.3d 105, 110-11 (2d Cir. 1997), and *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004), Andino contends that the government cannot secure a conspiracy conviction based on one type of drug when it alleges a conspiracy involving a different type of drug. Rather, he asserts, the government must prove that the drug in the indictment was the one actually involved in the conspiracy. But, whatever the merits of this contention, and his reliance on

10

*Wozniak* and *Rodriguez* to support it, he misreads our case law when he further takes it to mean that the government must show type-specific *scienter* on the defendant's part, as a result of alleging a conspiracy involving a specific type of drug.

Andino also seeks to rely on our decision in *United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008). *Hassan* arose from a conspiracy prosecution involving cathinone, which is harvested from a plant called khat and quickly decomposes into a different and less potent type of controlled substance known as cathine. The CSA designates cathinone as a Schedule I controlled substance and cathine as a Schedule IV controlled substance. Significantly, it does not designate khat as any type of controlled substance. The relationship between these three substances has given rise to various legal complications, one of which surfaced in *Hassan*.

We reversed Hassan's conviction on the ground that the jury instructions, combined with the testimony offered at trial, did not adequately differentiate between khat, cathine, and cathinone. In doing so, we rejected the government's claim that "Hassan could have been lawfully convicted by the jury even if the jury had found that he intended to import an illegal substance with *cathine*, and not an illegal substance with *cathinone*." *Id.* at 133 (emphasis in original). This argument lacked merit, we explained, because "the government conceded at trial that it was not trying an 'any' controlled substance charge, but rather, was limiting itself to trying a cathinone-related charge, as listed in the indictment." *Id.* As a result, "[a] conviction based on cathine, rather than cathinone, would have been an impermissible constructive amendment of the indictment" and could not stand. *Id.* (internal citation omitted).

Read in isolation, this language might seem to support Andino's claim that the government's indictment and statements at trial gave rise to a cocaine-specific *scienter* burden. In context, however, *Hassan* supports no such claim. Indeed, *Hassan* itself is explicit on this

11

point; the amended opinion takes pains to underscore its "adhere[nce] to [the] rule" that "scienter with respect to the type and quantity of controlled substance is not required to convict a defendant under the CSA." *Id.* at 113 n.1 (internal quotation omitted). [4]

Accordingly, we need not consider what the government's burden would have been, in the instant case, had the indictment alleged that it was cocaine that Andino intended to distribute, or had the government elsewhere committed itself to making such a showing. Here, neither circumstance is present. Instead, the indictment alleged only that Andino "intentionally[] and knowingly . . . conspire[d] . . to violate the narcotics laws of the United States," and that "[i]t was a part and an object of the conspiracy . . . that Andino . . . would and did distribute and possess with intent to distribute a controlled substance, to wit, 500 grams and more of . . . cocaine." J.A. 9. And at trial, the government repeatedly expressed the view that the jury could convict if it found that Andino "directly and personally participated in a transaction that in fact did involve cocaine." J.A. 401. There is, therefore, no reason in the case before us to depart from the statutory *scienter* rule in drug conspiracy cases, which, given Andino's personal and direct involvement in the drug transaction, required only a showing that Andino intended to distribute a controlled substance.

## II.    Sufficiency and Instructions Claims

Given the applicable *scienter* rule, Andino's sufficiency and instructions claims can be disposed of in short order.

---

[4] What is more, *Hassan* involved a number of special circumstances not present in this case, including jury instructions that failed to distinguish between *controlled* and *non-controlled* substances, *see* 578 F.3d at 133, and our recognition that "unique" due process issues raised by the khat/cathine/cathinone regulatory scheme required us to "scrutinize the [*Hassan*] instructions regarding *scienter* . . . very closely," *id.* at 132. *Hassan* thus stands for the proposition that in drug cases based on cathinone-specific indictments, the trial court must construct especially clear and precise jury instructions. But it in no way suggests that in drug cases based on type-specific indictments, the government must prove type-specific *scienter*.

*a.*      *Sufficiency of the Evidence*

We review sufficiency challenges *de novo*, asking "only whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Hassan*, 578 F.3d at 122 (internal quotation omitted). Andino challenges the sufficiency of the evidence only as it relates to the government's *scienter* burden; he does not challenge—and we therefore do not review— the sufficiency of the evidence as it relates to any other element of his conspiracy conviction.

In light of our conclusion that, to establish the *scienter* here, the government was required to prove only an intent to distribute a controlled substance, we find that the *scienter* burden was easily satisfied by Andino's admission that he thought the package contained marijuana. We therefore reject Andino's sufficiency claim.

*b.*      *The District Court's Jury Instructions*

"We will vacate a conviction on account of a missing requested instruction if (1) the requested instruction was legally correct; (2) it represents a theory of defense with basis in the record that would lead to acquittal; and (3) the theory is not effectively presented elsewhere in the charge." *United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999) (internal quotation omitted).

Andino alleges that the District Court erroneously refused to instruct the jury that "it must acquit Mr. Andino if he believed he would be receiving marijuana instead of cocaine." App. Br. at 52. For reasons already discussed, the proposed charge was an incorrect statement of law, and hence fails to satisfy the first prong of the *Prawl* test. Accordingly, we reject Andino's challenge to the jury instructions.

**CONCLUSION**

We have considered all of Andino's contentions on this appeal and have found in them no basis for relief. Accordingly, the judgment of the District Court is **AFFIRMED**.