*United States v. Helm*

# United States Court of Appeals
## for the Second Circuit

August Term 2022
Argued: October 17, 2022
Decided: January 25, 2023

No. 21-2207

UNITED STATES,

*Appellee*,

v.

MACENZIE HELM,

*Defendant-Appellant.*[*]

On Appeal from the United States District Court
for the District of Vermont

Before:   KEARSE, PARK, and PÉREZ, *Circuit Judges*.

Defendant-Appellant Macenzie Helm appeals from the judgment of conviction entered by the United States District Court for the District of Vermont (Crawford, *C.J.*) following his guilty plea to

---

[*] The Clerk is respectfully directed to amend the caption accordingly.

one count of conspiracy to distribute more than 50 kilograms (kg) of marijuana in violation of 21 U.S.C. §§ 841, 846. During a reverse-sting operation, Helm took possession of 10 kg of real and "sham" cocaine from an undercover agent and agreed to take possession of 40 kg more. After his arrest, Helm told law enforcement that he thought he was picking up marijuana or money, not cocaine. Helm later entered a plea agreement, in which he pleaded guilty to one count of conspiring to distribute marijuana. At sentencing, the government raised and the district court considered the 50 kg of cocaine as part of Helm's "relevant conduct" under Sentencing Guideline § 1B1.3(a)(1)(A). The district court sentenced Helm to 36 months' imprisonment.

We conclude that (1) the plea agreement permitted the government to raise that quantity of cocaine at sentencing, (2) the government was not judicially estopped from doing so, and (3) the district court did not err by considering the 50 kg of cocaine as part of Helm's "relevant conduct" because Guideline § 1B1.3(a)(1)(A) does not require scienter as to drug type when a defendant is directly and personally involved in a drug transaction. We thus **AFFIRM** the judgment of the district court.

---

DANIEL J. HAY, Sidley Austin LLP, Washington, DC (Michael A. Levy, Sidley Austin LLP, New York, NY, *on the brief*), *for Defendant-Appellant*.

MICHAEL P. DRESCHER, Assistant United States Attorney (Gregory L. Waples, Assistant United States Attorney, *on the brief*), *for* Nikolas P. Kerest, United States Attorney for the District of Vermont, Burlington, VT, *for Appellee*.

---

2

PARK, *Circuit Judge*:

Defendant-Appellant Macenzie Helm appeals from the judgment of conviction entered by the United States District Court for the District of Vermont (Crawford, *C.J.*) following his guilty plea to one count of conspiracy to distribute more than 50 kilograms (kg) of marijuana in violation of 21 U.S.C. §§ 841, 846. During a reverse-sting operation, Helm took possession of 10 kg of real and "sham" cocaine from an undercover agent and agreed to take possession of 40 kg more. After his arrest, Helm told law enforcement that he thought he was picking up marijuana or money, not cocaine. Helm later entered a plea agreement, in which he pleaded guilty to one count of conspiring to distribute marijuana. At sentencing, the government raised and the district court considered the 50 kg of cocaine as part of Helm's "relevant conduct" under Sentencing Guideline § 1B1.3(a)(1)(A). The district court sentenced Helm to 36 months' imprisonment.

We conclude that (1) the plea agreement permitted the government to raise that quantity of cocaine at sentencing, (2) the government was not judicially estopped from doing so, and (3) the district court did not err by considering the 50 kg of cocaine as part of Helm's "relevant conduct" because Guideline § 1B1.3(a)(1)(A) does not require scienter as to drug type when a defendant is directly and personally involved in a drug transaction. We thus affirm the judgment of the district court.

# I.  BACKGROUND

A.  <u>The Reverse Sting</u>[1]

In 2020, Macenzie Helm began to work for a Canadian drug-trafficking organization.   His responsibilities included picking up money, marijuana, and cocaine, and on a typical trip, Helm transported around 100 pounds of marijuana, delivered it to an address in Flushing, New York, and received payment in the range of $8,000 to $10,000.   He did this eight or nine times.   Helm enlisted his mother and his brother to assist, and he communicated by text with the Canadian leader of the organization.   Helm also made two trips to Pennsylvania to pick up bricks of cocaine, but both times before Helm collected the cocaine, the leader called off the deal due to money issues.   After these trips, Helm informed the organization that he did not want to be sent on cocaine pickups.

In the spring of 2020, the DEA seized a large quantity of cocaine in South America that was destined for Canada.   The DEA then devised a reverse-sting operation, which involved a controlled delivery of 50 kg of fake cocaine to the Canadian purchaser, which was the leader's drug-trafficking organization.[2]   An undercover DEA agent arranged a delivery of the 50 kg of cocaine to South Burlington, Vermont on September 21, 2020.

---

[1] The facts are taken from factual descriptions in the Presentence Investigation Report, adopted by the district court as its findings of fact.

[2] In "a classic 'reverse sting' operation," "a government agent agrees to provide a quantity of drugs for an agreed upon price."   *United States v. Chalarca*, 95 F.3d 239, 247 n.2 (2d Cir. 1996) (Scullin, *J.*, concurring).

On or about September 19, 2020, the leader texted Helm asking whether he was interested in making some easy money. Helm accepted the job and recruited his mother to assist. Helm and his mother drove to Vermont, and Helm called the undercover agent to confirm the time and location of the transaction.

When Helm arrived, he exited the vehicle and met with the undercover agent, who was wearing a wire. The undercover agent then told Helm that the delivery was in two parts, and the agent would pass Helm 10 first and then 40. Helm agreed. Before giving Helm the initial 10, the undercover agent confirmed that Helm had room for all 50 pieces, to which Helm replied in the affirmative. The undercover agent then asked whether Helm would take the full 50 right away, and Helm agreed. The agent removed a duffle bag from his vehicle, which contained 10 kg of fake cocaine and a zip-lock bag with 530 grams of real cocaine. Helm took the bag and placed it in his rental van. Surveillance agents promptly arrested him, and a search of the van discovered $11,000. In post-arrest interrogations, Helm admitted his involvement but insisted that he was never informed of what he was picking up and assumed it was money or marijuana. On at least one of his trips to Pennsylvania, however, Helm knew that he was to pick up cocaine, because although those deals fell through for monetary reasons, he admitted that on the second trip he actually tested the cocaine and reported to the leader of the organization that it was of good quality.

B.    Procedure History

1.    *The Plea Agreement*

Helm was charged with knowingly and willfully conspiring to distribute a controlled substance, and a grand jury returned an

indictment charging him with conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C). Helm pleaded not guilty.

Helm then entered into a plea agreement under which he pleaded guilty to one count of knowingly and willfully conspiring to distribute more than 50 kg of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C). In exchange for his guilty plea, the government agreed:

(1) "not [to] prosecute him in the District of Vermont for any other criminal offenses known to the United States . . . committed by him in the District of Vermont relative to drug distribution";

(2) to "move to dismiss the Indictment after sentencing";

(3) to recommend Helm "receive a two-point credit for acceptance of responsibility under Guideline § 3E1.1(a)," provided that Helm cooperate with the government; and

(4) to "move for an additional one-point credit for timely acceptance of responsibility, if the offense level (before acceptance) is 16 or greater."

Sealed App'x at SA-4 to -5.[3] The plea agreement also stated that Helm "had [a] full opportunity to consult with his attorney . . . concerning the applicability and impact of the Sentencing

---

[3] Some portions of the record have been filed under seal; they are hereby deemed unsealed to the extent that their contents are quoted or described in this opinion.

Guidelines (including, but not limited to, the relevant conduct provisions of Guideline Section 1B1.3)." *Id.* at SA-6.

Finally, the agreement stated that "[t]here shall be no limit on the information the United States may present to the Court and the Probation Office relevant to sentencing and the positions the United States may take regarding sentencing (except as specifically provided elsewhere in this agreement)." *Id.* at SA-2. The plea agreement contained no such exceptions.

2. *Change-of-Plea Hearing*

On May 7, 2021, the district court held a change-of-plea hearing. The district court ensured that Helm understood the terms of the plea agreement and confirmed that there were no "further agreement[s] with the Government which [weren't] written down in the plea agreement or the exhibit." App'x at A-19 to -24. The court then inquired about the factual basis of Helm's guilty plea, and the government observed that "for purposes of the factual proffer to the Court for this change of plea," the government would accept that "the objective" of Helm's participation in the conspiracy was "the distribution of marijuana," not cocaine. *Id.* at A-36.

The government explicitly reserved arguments related to cocaine for sentencing. For example, after accepting "for purposes of the factual proffer" that Helm believed he was transporting marijuana, the government stated that it "might disagree with [Helm's counsel's] characterization" that Helm "had never dealt in cocaine" because "that's an issue for sentencing." *Id.* at A-36 to -37. And later, the government stated that "there may be disagreements at sentencing involving the scope of relevant conduct, whether cocaine should be included in relevant conduct." *Id.* at A-41.

7

The district court recognized that the relevance of cocaine was "something the Government doesn't take a position on today, [but it] may be something in the future." *Id.* at A-41. Right after this colloquy, Helm pleaded guilty to conspiracy to distribute more than 50 kg of marijuana.

### 3. *Sentencing and Appeal*

The Presentence Investigation Report ("PSR") computed a Guidelines sentencing range of 51 to 63 months. In applying Guideline § 1B1.3(a)(1)(A), which includes a defendant's "relevant conduct," the PSR attributed 50 kg of cocaine to Helm.

Helm's sentencing memorandum objected to the PSR's inclusion of the 50 kg of cocaine as "relevant conduct." Helm claimed that he thought he was picking up marijuana and that he had previously informed the organization that he was not interested in transporting cocaine. Helm also never came into actual possession of 50 kg of cocaine, only the 530 grams of real cocaine.

The government replied that the cocaine was properly included because it was "reasonably foreseeable" that Helm's "role in the conspiracy would include the transportation of 50 kilograms of cocaine." Sealed App'x at SA-22. Within a day, the government realized its submission had confused Guideline § 1B1.3(a)(1)(A), about a defendant's *own* conduct, and Guideline § 1B1.3(a)(1)(B), about the reasonably foreseeable conduct of those with whom a defendant has jointly undertaken criminal activity. The government clarified that "U.S.S.G. § 1B1.3(a)(1)(A) *does not* call on the Court to consider foreseeability." *Id.* at SA-26. It argued that because Helm "personally and directly agreed to take all '50 pieces,'" "he should be held accountable for the 50 kilograms of cocaine [that] his

8

conspirators sent him to collect, without considering the foreseeability of the drug type and quantity." *Id.* at SA-27.

At sentencing, the district court heard argument on the inclusion of cocaine as part of Helm's "relevant conduct." Helm reiterated that he thought he was dispatched to pick up marijuana, not cocaine. The government credited Helm's consistency "in stating that he did not understand he was picking up cocaine," but explained that "unfortunately for Mr. Helm, that's not . . . a relevant consideration under the guidelines, specifically the definition of his relevant conduct under 1B1.3(a)(1)(A)." App'x at A-51. Its view was that Helm was directly involved with the 50 kg of cocaine even if he lacked knowledge of the type of drug because he agreed to pick up contraband, reached out to the undercover agent to coordinate the drug transaction, drove to the agreed meeting place, and agreed at several points to take all 50 kg of drugs from the undercover agent.

The district court agreed with the government. "[F]oreseeability and expectation and understanding [are] relevant to 1B1.3[(a)](1)(B) when dealing with other people's conduct in the context of a jointly undertaken criminal activity. That's not the guideline calculation that we're concerned with here," reasoned the district court. *Id.* at A-54. The district court concluded that "the PSR got it right that [Helm's] actions . . . included the attempt to obtain the 50 kilograms of cocaine." *Id.* at A-55. The district court sentenced Helm to a below-Guidelines sentence of 36 months' imprisonment followed by two years of supervised release.

Helm raises three arguments on appeal. First, the government breached the plea agreement by arguing that Helm's relevant conduct included cocaine. Second, the government was judicially estopped

from raising the 50 kg of cocaine at sentencing. Finally, the district court erred in applying Guideline § 1B1.3(a)(1)(A) by holding Helm responsible for the 50 kg of cocaine despite his lack of knowledge as to drug type.

## II. DISCUSSION

### A. Breach of the Plea Agreement

Helm first argues that the government breached his plea agreement by raising the 50 kg of cocaine as "relevant conduct" under Guideline § 1B1.3(a)(1)(A). We reject this argument based on the text of the plea agreement and the government's conduct during the proceedings.

#### 1. *Legal Standards*

"We review a plea agreement in accordance with principles of contract law and look to what the parties reasonably understood to be the terms of the agreement to determine whether a breach has occurred." *United States v. Sealed Defendant One*, 49 F.4th 690, 696 (2d Cir. 2022) (cleaned up). We do so by looking to "the precise terms of the plea agreements and to the parties' behavior." *United States v. Wilson*, 920 F.3d 155, 163 (2d Cir. 2019). "We construe plea agreements strictly against the government and do not hesitate to scrutinize the government's conduct to ensure that it comports with the highest standard of fairness." *Id.* at 162 (cleaned up).

We review Helm's breach-of-plea-agreement claim for plain error. "Under Rule 51(b) of the Federal Rules of Criminal Procedure, a defendant can preserve a claim of error 'by informing the court' of the claimed error when the relevant 'court ruling or order is made or sought.' If the defendant has 'an opportunity to object' and fails to

do so, he forfeits the claim of error." *Greer v. United States*, 141 S. Ct. 2090, 2096 (2021). If the defendant raises the forfeited claim on appeal, we review for plain error. "To establish plain error, a defendant must demonstrate: (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, we will then exercise our discretion to rectify this forfeited error only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Bleau*, 930 F.3d 35, 39 (2d Cir. 2019) (cleaned up). In the context of an alleged breach of a plea agreement, "the defendant must object in a manner sufficient to apprise the court and opposing counsel of the nature of his claims regarding the impropriety of the Government's change in position." *United States v. Taylor*, 961 F.3d 68, 81 n.12 (2d Cir. 2020) (cleaned up).

Helm argues that he preserved his breach-of-plea argument because he "consistently argued the conduct underlying his arrest 'should be assessed [based on] 50kg of marijuana not cocaine.'" Reply Br. at 4–5 (quoting Sealed App'x at SA-12). But Helm's argument at sentencing went to the merits of whether the district court should consider the 50 kg of cocaine as "relevant conduct," not whether the plea agreement barred the government from arguing so. Helm thus did not preserve the argument that the government acted with "impropriety" so as to put the district court and opposing counsel on notice, so we review for plain error. *Taylor*, 961 F.3d at 81 n.12.

2. *The Plea Agreement*

Helm had no reasonable expectation under the terms of the plea agreement that the government would refrain from raising the 50 kg of cocaine at sentencing.

The agreement states that "[t]here shall be no limit on the information the United States may present to the Court and the Probation Office relevant to sentencing and the positions the United States may take regarding sentencing (except as specifically provided elsewhere in this agreement)." Sealed App'x at SA-2. And the agreement included no such exceptions. It also stated that Helm had a "full opportunity to consult with his attorney [about the] agreement . . . including, but not limited to, the relevant conduct provisions of Guideline Section 1B1.3." *Id.* at SA-6.

When a "plea agreement expressly provide[s] for the government to take the very actions [the] Defendant now characterizes as [a] breach[] of that agreement," no breach has occurred. *Sealed Defendant One*, 49 F.4th at 694. Helm's plea agreement disclaimed any substantive limitations on the information the government could raise at sentencing. And for good measure, Helm acknowledged having the opportunity to consult with counsel about this specific issue. Together, these provisions ensured that there was no unfair surprise when the government raised the 50 kg of cocaine at sentencing as "relevant conduct." We thus reject Helm's argument that he reasonably expected the government to refrain from raising the 50 kg of cocaine at sentencing based on the text of the agreement.

### 3. *Parties' Behavior*

Nor did Helm have a reasonable expectation that the government would not raise the 50 kg of cocaine at sentencing based on the government's behavior.

A defendant's "reasonable expectations may be breached . . . where the Government's deviation [from the plea

12

agreement] produces serious unfairness for the defendant." *Wilson*, 920 F.3d at 163 (cleaned up). For example, "the government's change of position (without new justifying facts)" may "change[] the defendant's exposure so dramatically as to raise doubts whether the defendant could reasonably be seen to have understood the risks of the agreement." *United States v. Habbas*, 527 F.3d 266, 271 (2d Cir. 2008). Helm claims that the government violated his reasonable expectations by raising the 50 kg of cocaine at sentencing because (1) he lacked notice, and (2) the central promise of his plea agreement—*i.e.*, his consideration—was nullified. Neither contention has merit.

a. Notice

Helm first argues that he lacked notice that the government would raise the 50 kg of cocaine at sentencing, which breached his reasonable expectations. But this is belied by the record.

At the change-of-plea hearing, the government made clear that "for purposes of the factual proffer to the Court for this change of plea," the government would rely on Helm's admission that "the objective of" the conspiracy was "the distribution of marijuana."[4]

---

[4] To establish the factual basis for Helm's guilty plea, the Court must "assure itself" that Helm knew he was handling a controlled substance. *United States v. Maher*, 108 F.3d 1513, 1524 (2d Cir. 1997); *see* Fed. R. Crim. P. 11(b)(3). "[T]he government need not prove *scienter* as to drug *type* or *quantity* when a defendant personally and directly participates in a drug transaction underlying a conspiracy charge." *United States v. Andino*, 627 F.3d 41, 47 (2d Cir. 2010). Rather, the government is required to show that the defendant knew "a controlled substance of *one type or another*" was involved. *Id.* (emphasis added). So Helm's admission that he believed he was handling marijuana was sufficient to prove the factual basis of his guilty plea. It does not follow, however, that the government's acceptance

13

App'x at A-36.   As to the cocaine at issue in the conspiracy, however, the government stated explicitly, "that's an issue for sentencing."   *Id.* at A-37.   The government later reiterated that "there may be disagreements at sentencing involving the scope of relevant conduct, *whether cocaine should be included in relevant conduct for purposes of sentencing*."   *Id.* at A-41 (emphasis added).

At oral argument, Helm's counsel stated that these statements were "a bit vague" and thus provided insufficient notice of the government's intentions at sentencing, but this argument does not withstand scrutiny.   Oral Argument at 2:41.   The district court clearly stated that the government was reserving cocaine-related arguments for sentencing, recognizing on the record that the cocaine is "something the Government doesn't take a position on today, [but] may be something in the future."   App'x at A-41.   In fact, Helm's counsel shared this understanding, noting that Helm was admitting only to knowledge of marijuana at the change-of-plea hearing and did not want to "have [his] hands tied at sentencing," in a way that would allow "someone [to] say we acknowledge certain facts."   *Id.* at A-38. These acknowledgments of the government's intentions occurred *before* Helm pleaded guilty, and at no point did he object.

b.      Consideration

Helm next argues that the plea agreement could be reasonably understood as limiting the government's sentencing advocacy, but the government breached when it "rendered the central part of the

---

of his admission of knowledge of that controlled substance to establish the factual basis of Helm's guilty plea was an implied promise to forego raising other information at sentencing.

14

plea agreement an empty formality that conferred no benefit on Helm" by raising the 50 kg of cocaine at sentencing. Appellant's Br. at 29. Helm contends that he pleaded guilty based on his understanding "that the Government was giving up the right to argue at sentencing that he was a part of the drug trafficking organization's supposed cocaine conspiracy." *Id.* at 27. At oral argument, Helm's counsel stated, "there would have been no reason, no benefit for changing the [charge]" from cocaine to marijuana but for the government's implied promise not to raise the 50 kg of cocaine at sentencing. Oral Argument at 5:27.

Plea agreements are examined using principles of contract law, including the cardinal rule that "contracts are not valid unless supported by consideration." *United States v. Brunetti*, 376 F.3d 93, 95 (2d Cir. 2004). "[A] guilty plea can be challenged for contractual invalidity, including invalidity based on a lack of consideration." *Id.* In exchange for a defendant's guilty plea, the government may offer consideration that comes in many forms, including reduced sentencing exposure, a speedier "correctional process[]," and the elimination of "the practical burdens of a trial." *Brady v. United States*, 397 U.S. 742, 752 (1970).

Helm's plea agreement is not void for lack of consideration. The government points to several benefits that Helm received by pleading guilty to marijuana conspiracy instead of proceeding to trial on cocaine conspiracy. For example, the reduced stigma of a marijuana conviction compared to a cocaine conviction, a two-point Guidelines credit for acceptance of responsibility, a one-point Guidelines credit for timely acceptance of responsibility, and a promise that the government would not prosecute him for other

15

offenses related to drug distribution. *See supra* at 6–7. If Helm had not pleaded guilty, he would not have received these benefits, which are adequate consideration for a guilty plea. Helm points to no authority that the change in charge (from cocaine to marijuana conspiracy) implies a promise that the government would forbear raising the 50 kg of cocaine. Helm also points to no evidence in the record that he bargained for or requested that the government not raise the 50 kg of cocaine at sentencing. We decline to infer such a promise was made, especially when Helm confirmed to the district court that he made no "further agreement" with the government. App'x at A-23 to -24; Sealed App'x at SA-4 to -5.

We thus conclude based on the terms of the plea agreement and the parties' conduct that the government did not breach the "reasonable understanding and expectations of the defendant" by raising the 50 kg of cocaine at sentencing. *Wilson*, 920 F.3d at 163.

B.     Judicial Estoppel

Helm next argues that the government was judicially estopped from raising the 50 kg of cocaine at sentencing. He asks us to vacate his sentence and remand for resentencing before a new judge. Even assuming that principles of judicial estoppel are applicable in this context, we conclude that the government was not so estopped here.

1.     *Legal Standards*

This Court has never discussed whether the government may be judicially estopped in criminal prosecutions as other Courts of Appeals have, and we need not decide that question today. *See United States v. Quinones*, 511 F.3d 289, 321 n.22 (2d Cir. 2007); *cf. United States v. Grap*, 368 F.3d 824, 830–31 (8th Cir. 2004). *But see*

16

*United States v. Binday*, 804 F.3d 558, 599 (2d Cir. 2015) (reviewing on the merits an argument that the government was judicially estopped from making an argument at sentencing based on its position at trial). But in private civil litigation, we have held that "[j]udicial estoppel is properly invoked where: (1) a party's later position is clearly inconsistent with its earlier position, and (2) the party's former position has been adopted in some way by the court in an earlier proceeding." *Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 272 (2d Cir. 2019). In some cases, we have also required a showing of "an unfair advantage." *Id.*

We review for plain error. For much the same reason that Helm failed to preserve his breach-of-agreement argument, *see supra* at 11–12, we also conclude that Helm failed to preserve his judicial-estoppel argument. Helm's arguments before the district court went to whether the cocaine was properly considered "relevant conduct," not to whether the government acted inconsistently or deceitfully in making this argument.

### 2. *Estoppel in Helm's Case*

Even accepting that judicial estoppel could apply in this context, Helm has failed to show that it would be appropriate. First, there was no inconsistency between the government's arguments at the change-of-plea hearing and sentencing. "[T]here must be a true inconsistency between the statements in the two proceedings. If the statements can be reconciled there is no occasion to apply an estoppel." *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72–73 (2d Cir. 1997). To demonstrate the factual basis for Helm's guilty plea under 21 U.S.C. § 841, the government had to show that Helm "intended to distribute and possess with the intent to distribute *any* controlled

17

substance." *United States v. Abdulle*, 564 F.3d 119, 126 (2d Cir. 2009); *see supra* note 4. Helm's admission that he thought he was picking up marijuana satisfied this requirement, so the government temporarily accepted this admission to support the factual basis for Helm's guilty plea. But at the same hearing, the government expressly reserved the right to raise the 50 kg of cocaine at sentencing as "relevant conduct," which the district court acknowledged and to which Helm did not object before pleading guilty. *See* App'x at A-37 to -38, A-41.

Second, the district court never adopted the position that the cocaine issue was immaterial to Helm's sentence. The district court was aware that the government's factual basis for Helm's plea was based on marijuana, whereas its argument at sentencing would focus on cocaine. *See supra* at 14–15. In fact, the district court noted that the "Government doesn't take a position on" cocaine for purposes of "the factual representations" at the change-of-plea hearing, but the cocaine issue "may be something in the future." App'x at A-41.

Finally, Helm fails to show that the government "derive[d] an unfair advantage or impose[d] an unfair detriment" on him. *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001). Although Helm faced a higher sentence once the cocaine was incorporated as part of his "relevant conduct," it was not "unfair" for purposes of judicial estoppel. The Guidelines contemplate that the government may bring information to a sentencing court's attention, including a defendant's "relevant" conduct that is different from his charged conduct. *See* Guideline § 1B1.3 application n.1 (2021). Indeed, the government explicitly stated its intent to do so here, as the district court acknowledged during the change-of-plea hearing. We reject

18

Helm's judicial-estoppel argument because we find no merit in Helm's suggestion that he faced an "unfair detriment" based on the government doing something that it stated clearly it might do before Helm entered into the plea agreement.

C.     Relevant Conduct Under Guideline § 1B1.3(a)(1)(A)

Finally, Helm argues that the district court erred by considering the 50 kg of cocaine as part of his "relevant conduct" because Helm lacked knowledge that the controlled substance was cocaine and actually received only 530 grams of real cocaine.   We disagree.

1.     *Legal Standards*

Before the Sentencing Guidelines, "the law was settled that a defendant's wrongful conduct, beyond the conduct constituting the offense of conviction, was *relevant* to punishment."   *United States v. Shonubi*, 103 F.3d 1085, 1088 (2d Cir. 1997) (citing *Williams v. New York*, 337 U.S. 241, 246–47 (1949)).   There was little, if any, limitation to what "unconvicted" conduct a sentencing court could consider.   *Id.* One "major controversy" in the creation of the Sentencing Guidelines was "whether a guideline should be selected according to a defendant's so-called 'real offense'—what he did—or only according to the so-called 'charge offense'—the offense for which he was convicted."   *United States v. Guerrero*, 863 F.2d 245, 248 (2d Cir. 1988). The Guidelines sought to strike a balance between "punishing only for the offense of conviction and punishing for all wrongful conduct that could be established at a sentencing hearing."   *Shonubi*, 103 F.3d at 1088.   Compromise came in the form of Sentencing Guideline § 1B1.3, which limits what "unconvicted" conduct may be considered "relevant" for sentencing purposes.   *Id.*

19

The Guidelines recognize two forms of "relevant conduct." First, it includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." Guideline § 1B1.3(a)(1)(A). In other words, Guideline § 1B1.3(a)(1)(A) concerns a defendant's *own* relevant conduct.

Second, "relevant conduct" includes, "in the case of a jointly undertaken criminal activity . . . all acts and omissions of others that were[] (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity[] that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." Guideline § 1B1.3(a)(1)(B). This Guideline thus concerns the acts of *others* with whom a defendant jointly undertook criminal activity. At Helm's sentencing, the district court explained that Guideline § 1B1.3(a)(1)(B) was "not the guideline . . . that we're concerned with here" and proceeded to sentence Helm under Guideline § 1B1.3(a)(1)(A). App'x at A-54.

"[F]or a district court's application of the Guidelines to the specific facts of a case, we . . . follow an 'either/or approach,' adopting a *de novo* standard of review when the district court's application determination was primarily legal in nature, and adopting a 'clear error' approach when the determination was primarily factual." *United States v. Gotti*, 459 F.3d 296, 349 (2d Cir. 2006). The parties agree that there are few, if any, disputed facts, so we review *de novo*.

20

In *United States v. Chalarca*, we stated that "a defendant who is a party to . . . a [drug] conspiracy is accountable for the quantities of narcotics in which he had a direct, personal involvement." 95 F.3d 239, 243 (2d Cir. 1996). A defendant's "direct, personal involvement" with a quantity of drugs includes (1) "constructive[] possess[ion] [of] drugs or actual[] possess[ion]," *id.* at 243, 244; and (2) nonpossessory conduct such as a defendant agreeing to sell drugs or facilitating a drug transaction, *see United States v. Schaper*, 903 F.2d 891, 898 (2d Cir. 1990); *Guerrero*, 863 F.2d at 250.

The question here is whether Guideline § 1B1.3(a)(1)(A) requires a defendant to know the *type* of drug with which he has "direct, personal involvement," *Chalarca*, 95 F.3d at 243, for the drug quantity to be considered as relevant conduct. Helm attempts to distinguish how Guideline § 1B1.3(a)(1)(A) treats possessory and nonpossessory conduct in a drug conspiracy. He concedes that "it is possible that Helm could be held responsible for the 530 grams of real cocaine that he actually received," but he argues that his "relevant conduct" cannot include the full 50 kg of cocaine because he never had "possession of 50 kilograms of cocaine" and "did not intend to do so." Appellant's Br. at 41; *see* Reply Br. at 26–28.

In the possessory context, we have long held that there is no scienter requirement as to drug type and quantity under Guideline § 1B1.3(a)(1)(A). In *United States v. Obi*, we held that when a defendant believed he was trafficking cocaine rather than heroin, the district court properly considered the full quantity of heroin that the defendant had attempted to smuggle by swallowing forty-three drug balloons. 947 F.2d 1031, 1032 (2d Cir. 1991); *see also United States v. Castrillon*, 376 F.3d 46, 47 (2d Cir. 2004) ("[O]ur prior caselaw hold[s]

that a defendant need not know the type or quantity of drugs when he is in direct possession of them as part of a conspiracy.").

We have not yet specifically addressed, however, whether scienter is required for drug type in the nonpossessory context under Guideline § 1B1.3(a)(1)(A). Nonpossessory conduct may include a defendant who—without ever coming into actual or constructive possession—agrees to purchase a quantity of drugs or plays a key role in facilitating or orchestrating a drug transaction. *See, e.g.*, *Chalarca*, 95 F.3d at 244 (explaining that "aware[ness] that the purpose of [the] trip to the scene was to purchase [drugs]" and "knowledge of what was taking place" would show direct and personal involvement). In this context, we have implied a strict-liability rule for drug *quantity*. *See, e.g.*, *id.* at 243 (citing *United States v. Lockhart*, 37 F.3d 1451, 1454 (10th Cir. 1994) (holding that relevant conduct includes the full quantity of drugs despite the defendant's lack of knowledge of the quantity involved)).[5]

2.  *Interpretation of Guideline § 1B1.3(a)(1)(A)*

In the context of a drug conspiracy, "relevant conduct" under Guideline § 1B1.3(a)(1)(A) includes a quantity of drugs with which a defendant is directly and personally involved even if he lacks knowledge of the specific drug type. The text of the Guidelines, the

---

[5] *See also, e.g.*, *United States v. Pitcher*, 7 F. App'x 119, 121 (2d Cir. 2001) (holding that a defendant was responsible for the full quantity of drugs when he "recruited the courier, helped him obtain a passport, and drove him to the airport" despite the defendant not knowing the quantity involved); *United States v. Atehortua*, 278 F. App'x 77, 79 (2d Cir. 2008) (holding that a defendant was responsible for the full quantity of drugs when he knowingly drove to the "scene of the crime in order to purchase drugs").

Guidelines commentary, and general background principles of sentencing support this interpretation.

a.    Text

"Statutory interpretation, as we always say, begins with the text."   *Ross v. Blake*, 578 U.S. 632, 638 (2016); *United States v. Lewis*, 93 F.3d 1075, 1080 (2d Cir. 1996) ("Interpretation of the Guidelines is similar to statutory construction.").   "When resolving a dispute over a statute's meaning, our principal task is to afford the law's terms their ordinary meaning at the time Congress adopted them.   When the statutory text is plain and unambiguous, our sole function is to enforce it according to its terms."   *United States v. Bedi*, 15 F.4th 222, 226 (2d Cir. 2021) (cleaned up).

Sentencing Guideline § 1B1.3(a)(1)(A) includes as "relevant conduct" "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense."   Subsection (A) includes no scienter requirement.   In the context of controlled-substance offenses, a defendant's "relevant conduct" may include drugs "with which he was directly involved." *Chalarca*, 95 F.3d at 243 (quoting Guideline § 1B1.3(a)(1)(A) application n.2 (1995)).   So a defendant may be held responsible for drugs with which he was "directly involved" even if he did not know the specific drug type.

By comparison, Guideline § 1B1.3(a)(1)(B) (the neighboring provision for the acts of others) *does* contain a scienter requirement, as "acts and omissions of others" must be "reasonably foreseeable in connection with that criminal activity."   We have interpreted this language to require a sentencing court to "make findings as to [a

defendant's] knowledge and [the] foreseeability" of "the full quantity" and "different *types* of narcotics" involved in jointly undertaken criminal activity before that drug quantity may be considered "relevant conduct." *United States v. Negron*, 967 F.2d 68, 72 (2d Cir. 1992) (emphasis added). "[F]ollowing both the presumption of consistent usage and meaningful variation, and the textual canon of *expressio unius est exclusio alterius*," *Novella v. Westchester County*, 661 F.3d 128, 142 (2d Cir. 2011), the presence of a reasonable-foreseeability scienter requirement in Guideline § 1B1.3(a)(1)(B) as to drug quantity and type implies that the omission of a similar provision in Guideline § 1B1.3(a)(1)(A) was deliberate. So Guideline § 1B1.3(a)(1)(B)'s expression of a scienter requirement as to drug type permits a negative inference that Guideline § 1B1.3(a)(1)(A) lacks such a requirement.

b.      Guidelines Commentary

The commentary further supports the interpretation that Guideline § 1B1.3(a)(1)(A) lacks a scienter requirement as to drug type. "Commentary and application notes in the Guidelines must be given controlling weight unless they: (1) conflict with a federal statute, (2) violate the Constitution, or (3) are plainly erroneous or inconsistent with the Guidelines provision they purport to interpret." *United States v. Moore*, 916 F.3d 231, 237 (2d Cir. 2019). Neither party contends that such exceptions apply here.

First, Application Note 3(D) suggests there is no scienter requirement under Guideline § 1B1.3(a)(1)(A). "With respect to offenses involving contraband (including controlled substances), the defendant is accountable under subsection (a)(1)(A) for all quantities of contraband with which he was directly involved." Guideline

24

§ 1B1.3(a)(1)(B) application n.3(D) (2021).  By contrast, under section 1B1.3(a)(1)(B) a defendant is responsible for "all quantities of contraband that were involved in transactions carried out by other participants, *if those transactions . . . were reasonably foreseeable*."  *Id*. (emphasis added).  "The requirement of reasonable foreseeability applies only in respect to the conduct . . . of others under subsection (a)(1)(B).  It does not apply to conduct that the defendant personally undertakes . . . under subsection (a)(1)(A)."  *Id.*

Second, Application Note 4 to Section 1B1.3 offers an illustrative example: "a defendant who transports a suitcase knowing that it contains a controlled substance . . . is accountable for the controlled substance in the suitcase regardless of his knowledge or lack of knowledge of the actual *type* or amount of that controlled substance."  Guideline § 1B1.3(a)(1)(A) application n.4(A)(i) (2021) (emphasis added).  Although this example relates to possession, the commentary notes that the suitcase example is "conceptually similar" to a nonpossessory example involving a defendant who personally offloaded some quantity of marijuana but is responsible for the full quantity (including marijuana he never possessed) because he "aided and abetted the off-loading of the entire shipment."  *Id.*  This conceptual similarity suggests that in both examples, the "lack of knowledge of the *actual type*" of drug is not a bar to considering the full quantity of drugs as relevant conduct.

c.  Background Principles

Reading  Guideline  § 1B1.3(a)(1)(A)  against  background principles of sentencing further confirms that there is no scienter requirement as to drug type.  The Guidelines were written with an understanding of the longstanding practice that "a sentencing judge

25

could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law." *Williams*, 337 U.S. at 246. This Court has read the "relevant conduct" Guidelines in parallel with the substantive conspiracy statute to which Helm pleaded guilty. In *United States v. Andino*, we held that "the government need not prove *scienter* as to drug *type* or *quantity* when a defendant personally and directly participates in a drug transaction underlying a conspiracy charge." 627 F.3d 41, 47 (2d Cir. 2010). We similarly conclude that this lack of a scienter requirement also applies at sentencing under Guideline § 1B1.3(a)(1)(A). District courts may generally consider more information at sentencing than during the liability phase of proceedings, so it would be odd to read into the Guidelines a scienter requirement that is not a requirement for liability. *See United States v. Reese*, 33 F.3d 166, 174 (2d Cir. 1994).

Finally, we note that two of our sister circuits have also interpreted Guideline § 1B1.3(a)(1)(A) as lacking a scienter requirement as to drug type in the nonpossessory context. *See United States v. Strange*, 102 F.3d 356, 360–61 (8th Cir. 1996); *United States v. Salazar*, 5 F.3d 445, 446–47 (9th Cir. 1993).

3. *Application*

The district court did not err by considering the 50 kg of cocaine as part of Helm's relevant conduct. First, Helm's relevant conduct under Guideline § 1B1.3(a)(1)(A) includes his possession of the 10 kg of real and sham cocaine in the duffel bag despite his alleged lack of knowledge that it was cocaine. *See Obi*, 947 F.2d at 1032.

Second, Helm's relevant conduct also includes the additional 40 kg of cocaine that he agreed to transport. Helm's nonpossessory

conduct constitutes "direct, personal involvement" with the 40 kg of cocaine under Guideline § 1B1.3(a)(1)(A) because he drove to the drug transaction, called the undercover agent to confirm the time and location, exited the vehicle to speak with the undercover agent, agreed to take delivery of all 50 pieces, and confirmed that he would take 10 first and then the additional 40 right away. We have found similar conduct sufficiently direct and personal to constitute an "act" under Guideline § 1B1.3(a)(1)(A). *See, e.g., Chalarca*, 95 F.3d at 243 (citing with approval *Lockhart*, 37 F.3d 1451, in which a defendant knew he was driving his coconspirator to a cocaine purchase despite the defendant never handling the drugs). Helm's personal and direct involvement with the 40 kg of cocaine—despite his alleged lack of knowledge that it was cocaine—permitted the district court to consider this quantity as part of his relevant conduct.

Finally, we reject Helm's argument that the district court erred by considering the 50 kg of cocaine because some quantity of the cocaine did not exist. Helm points to no authority suggesting a defendant's relevant conduct includes quantities of real drugs only.[6] Such a position is untenable and would require law enforcement to use large quantities of real drugs and/or money in sting or reverse-sting operations.[7] *See United States v. Crawford*, 991 F.2d 1328, 1333

---

[6] We have permitted the use of "look-alike" or "sham" cocaine to prove a defendant's criminal liability for drug conspiracy charges and to calculate a defendant's Sentencing Guidelines range. *See Andino*, 627 F.3d at 43; *United States v. Caban*, 173 F.3d 89, 92 (2d Cir. 1999). In both cases, the fact that some of the drugs were "sham" was not a defense.

[7] Although Helm raised the issues of sentencing manipulation and entrapment in passing, these concerns are attenuated here. It is true that reverse-sting operations provide "the government [with] a greater than

(7th Cir. 1993) ("[T]he DEA, as seller or buyer, need not actually intend to produce the drugs or the money promised to [the] defendant during . . . an undercover operation. . . . The Guidelines treat success and failure, conviction and no conviction, alike in drug cases, so long as the amounts are ascertainable." (cleaned up)).

## III. CONCLUSION

The plea agreement and principles of judicial estoppel did not bar the government from raising as "relevant conduct" the 50 kg of cocaine Helm agreed to handle as part of a drug conspiracy. Moreover, in the drug-conspiracy context, Sentencing Guideline § 1B1.3(a)(1)(A) lacks a scienter requirement as to drug type when a defendant is directly and personally involved in the drug transaction, so the district court did not err in taking the 50 kg of cocaine into account as Helm's own relevant conduct. For the foregoing reasons, we affirm. We have considered all of Helm's contentions on this appeal and have found them to be without merit.

---

usual ability to influence a defendant's ultimate Guidelines level and sentence" because the government controls the quantity and type of drug. *Caban*, 173 F.3d at 93. A defendant could, in theory, face punishment "for the government's conduct instead of his own." *Crawford*, 991 F.2d at 1334. In light of such risks, the Guidelines commentary encourages sentencing courts to consider as relevant conduct the "agreed-upon" quantity of drugs (instead of the amount actually delivered by the government) and to make a downward departure when the government sells drugs "substantially below the market value." Guideline § 2D1.1 application nn.5, 27(A) (2021). In Helm's case, the district court did consider the agreed-upon quantity of 50 kg, and there is no allegation that the government discounted the price as an enticement.